**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Thomas O'Brien, | CV-02-91-PHX-JAT |
| Plaintiff/Counterdefendant, | |
| v. | **ORDER** |
| American Family Insurance Group, d/b/a American Family Mutual Insurance Company, | |
| Defendant/Counterclaimant. | |

Pending before the Court are Defendant's Motion for Partial Summary Judgment (Doc. # 149) and Defendant's Partial Motion to Strike Plaintiff's Statement of Facts (Doc. # 164).

**I. INTRODUCTION**

    **A.**    **Structure Claim**

On or about September 13, 1999, following an under-slab water leak at his residence, Plaintiff Thomas O'Brien ("O'Brien") made a claim under a homeowner's insurance policy issued by American Family Mutual Insurance Company ("American Family"). American Family's adjuster, Steve Greaves ("Greaves"), visited the O'Brien residence and inspected the water leak. Thereafter, O'Brien hired a plumber to repair the leak. On September 21, 1999, American Family paid the plumber's invoice minus the applicable deductible.

In April 2000, O'Brien called Greaves and informed him of cracks that had developed in the residence's slab. Greaves inspected the residence and told O'Brien that an engineer would be hired to determine whether or not the cracks were related to the under-slab water leak. On May 3, 2000, the engineer, Ron Starling ("Starling"), inspected the residence and issued a report on May 16, 2000. The report provided that the cracks were related to earth movement likely triggered by the water leak infiltrating the soils and recommended certain repairs to the slab.

On May 16, 2000, Greaves contacted Truesdell Corporation, a concrete repair contractor, to request an estimate on the recommended slab repairs. The record is not clear whether Truesdell issued a separate estimate or whether the estimate was subsumed in the estimate prepared by KNC Contracting, a general contractor that provided a repair estimate on June 16, 2000. KNC Contracting's estimate, in the amount of $56,005.98, included slab repairs as well as the pack out and storage of O'Brien's personal property. Believing KNC Contracting's estimate to be inflated, American Family negotiated a lower estimate in the amount of $50,921.76.

On July 13, 2000, American Family issued a check in the amount of $10,180.89 to O'Brien for the pack out and storage of personal property. On July 14, 2000, American Family issued a check to O'Brien for the repair of the slab.[1] During the repairs, which began on or about July 21, 2000, Greaves authorized O'Brien and his mother to move into the Embassy Suites, which would bill American Family directly.

On or about August 8, 2000, O'Brien terminated the contract with KNC Contracting and would not allow it to finish the job. O'Brien testified in his deposition that he was not satisfied with the work and attitude of KNC Contracting and that he could not reach Greaves to discuss the matter. O'Brien paid $12,225.01 to KNC Contracting for the repairs performed prior to the termination of the contract. Immediately thereafter, on August 9, 2000, O'Brien signed a contract with James O'Toole ("O'Toole"), a public adjuster.

---

[1] The Court cannot discern from the record the exact amount of the check.

- 2 -

On August 22, 2000, Greaves met with O'Toole at the O'Brien residence to inspect additional areas of damage that O'Toole alleged were related to the under-slab water leak. During the meeting, Greaves told O'Toole that he would need to solicit opinions from engineers and contractors to determine the causal relationship between the additional damage and the loss, as well as solicit estimates for the additional repairs. O'Brien claims that Greaves refused to consider any information regarding the additional areas of damage, became angry, and walked out of the meeting.

During September 2000, American Family alleges that the claim investigation was on hold pending estimates from O'Toole concerning the repair of the additional areas of damage. However, this conflicts with Greaves' claim that he intended to solicit opinions and estimates from other individuals. Further, the record indicates that O'Toole and Greaves exchanged correspondence during this time period and the Court is not cited to anything in the record, other than Greaves' testimony, indicating that Greaves was expecting estimates from O'Toole.

In October 2000, Greaves wrote to O'Toole requesting that Semmens Engineering be allowed to inspect the O'Brien residence and perform soil testing. By letter dated October 18, 2000, O'Toole complained of Semmens Engineering's partiality and refused to allow it access to the residence. However, unbeknownst to American Family, O'Toole had previously hired Thomas Engineering to perform soil testing on the residence. Thomas Engineering's September 28, 2000 report recommended additional slab repair in certain areas of the home. The report was not provided to American Family until October 31, 2000.[2] Also on October 31, 2000, O'Toole provided American Family with a new estimate from KNC Contracting in the amount of $95,031.76.[3]

Starling, the engineer who first inspected the residence, reviewed the Thomas

---

[2] While O'Brien claims that the Thomas Engineering report was provided to American Family on October 18, 2000, he cites to nothing in the record to support that claim.

[3] At some point, Greaves reviewed the KNC Contracting estimate and concluded that it contained line items for work that was unnecessary and/or not related to the under-slab water leak, such as replacing kitchen cabinets, countertops, doors, and hardware.

- 3 -

1  Engineering report and reported his findings to Greaves on December 5, 2000. Starling
2  agreed with the report except for the recommended slab remediation in the master bedroom.
3  Starling did not believe the damage was related to the leak under the garage slab. Starling
4  requested that he be allowed to re-inspect the residence. On December 27, 2000, Starling re-
5  inspected the residence.[4]

On January 8, 2001, Starling, Greaves, a representative of Truesdell Corporation, O'Toole, and O'Brien, met at the residence for another inspection. On January 10, 2001, Starling issued a report on the inspection and Truesdell Corporation issued an estimate for the additional repairs recommended in the report. On January 12, 2001, American Family issued a check in the amount of $3,694.75 to O'Brien for the additional repairs as estimated by Truesdell Corporation.

On January 31, 2001, O'Toole demanded appraisal under the terms of the American Family insurance policy. On February 12, 2001, American Family's appraiser, Greg McMahon ("McMahon"), requested from O'Toole that O'Brien's appraiser, John Hall ("Hall"), contact him to discuss the appraisal. Between February 28, 2001 and August 6, 2001, McMahon sent three letters to Hall requesting that Hall contact him to discuss the appraisal. McMahon finally spoke with Hall on August 7, 2001 and was told that Hall would be in Phoenix in thirty (30) days to discuss the appraisal.

On September 12, 2001, McMahon sent a letter to Hall since he had not heard from him. The next day, Hall responded and suggested a meeting in mid-October. On October 9, 2001, Hall sent his first estimate in the amount of $104,214.94 to McMahon. On November 6, 2001, Hall submitted a second estimate in the amount of $106,396.04. The second estimate was based on a March 23, 2001 report prepared by Soilutions, which report was first provided to McMahon in November 2001. After conferring with Starling about the Soilutions report, McMahon submitted a revised estimate in January 2002.

Over the next few months, McMahon and Hall could not agree on the amount of the

---

[4]O'Brien claims that Starling re-inspected the residence on December 14, 2000, but cites to nothing in the record to support that claim.

1  loss. They scheduled a meeting with an umpire in early May 2002. On May 2, 2002, Hall
2  informed McMahon that he had hired two new structural engineers and would be submitting
3  their reports at the meeting with the umpire. On May 3, 2002, Hall sent to McMahon the
4  new reports and a revised estimate of $164,766.67 RCV/$162,657.66 ACV. McMahon
5  submitted two estimates, the first for $66,945.61 RCV/$65,542.11 ACV and the second, from
6  KNC Contracting, for $65,011.61. On May 10, 2002, the umpire awarded O'Brien
7  $93,010.99 RCV/$88,359.50 ACV. American Family contends that the umpire awarded the
8  cost to replace undamaged items and the expenses of O'Brien's multiple consultants;
9  however, the appraisal award does not reflect a line item breakdown of the award.

10  Soon after the appraisal award, O'Toole received a repair estimate from Comstock
11  Development, Inc., in the amount of $30,982.95. American Family contends this estimate
12  included all necessary repairs except the flooring, while O'Brien contends that the estimate
13  was for partial repairs. The record before the Court is not clear as to the scope of repairs that
14  Comstock Development, Inc., agreed to perform and actually performed. O'Toole also
15  received a $3,491.00 estimate from United Floor Covering for flooring installation. United
16  Floor Covering installed the flooring and was paid for its services.

**B.   Additional Living Expenses Claim**

18  Back in January 2001, O'Toole notified American Family that O'Brien's son, Tommy,
19  had returned home and that they needed another hotel room. However, the arrangement
20  eventually agreed upon required American Family to pay $75.00 per night for Tommy to rent
21  a room at the home of Debbie Frederick ("Frederick"), a family friend. For payment,
22  Frederick provided O'Brien a series of invoices setting forth the rental amount due. Either
23  O'Brien or his mother would issue a check to Frederick for the invoiced rental amount.
24  Thereafter, O'Brien would submit a copy of the rental invoice to American Family for
25  reimbursement. American Family alleges it reimbursed O'Brien a total of $17,250.00 for

Tommy's rental of the room in Frederick's home.[5]

At some point, American Family discovered information that led it to believe that O'Brien committed fraud with regard to Tommy's additional living expenses.[6] Specifically, American Family obtained copies of cancelled checks showing that Frederick, after cashing the rent checks, would issue checks for the same amount back to O'Brien or his mother. American Family also learned at some point that Tommy was in custody for an alleged parole violation between March 15, 2001 and May 8, 2001. In response to the fraud allegations, O'Brien alleges that he previously loaned $15,000.00 to Frederick and that the checks were simply repayment of the loan. This is supported by Frederick's testimony. However, the record contains no independent evidence of the loan.[7] As for the time Tommy spent in custody, O'Brien alleges that he continued to pay the rent because Tommy's personal items remained in Frederick's home and he intended to return. Because of the discovery of evidence suggesting that Tommy's additional living expenses were fraudulent, American Family refused to pay the appraisal award issued on May 10, 2002 and instead sought leave to assert the fraud counterclaim on May 15, 2002.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary

---

[5] Because of inconsistencies in the record, the Court is unable to determine from the record whether the actual total reimbursed for Tommy's additional living expenses was $17,250.00 or $17,225.00.

[6] While the exact discovery date is not clear from the record, the copies of the two checks from Frederick to O'Brien and his mother are dated April 24, 2002. Also, American Family filed its motion to amend its answer to assert the fraud counterclaim on May 15, 2002.

[7] While O'Brien attached copies of a ledger to his response, the Court is not cited to any other facts or testimony that enable it to conclusively determine the significance of the ledger.

- 6 -

1 judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, summary judgment is mandated
2 "...against a party who fails to make a showing sufficient to establish the existence of an
3 element essential to that party's case, and on which that party will bear the burden of proof
4 at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

5 Initially, the movant bears the burden of pointing out to the Court the basis for the
6 motion and the elements of the causes of action upon which the non-movant will be unable
7 to establish a genuine issue of material fact. *Id.* at 323. The burden then shifts to the non-
8 movant to establish the existence of material fact. *Id.* The non-movant "must do more than
9 simply show that there is some metaphysical doubt as to the material facts" by "com[ing]
10 forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec.*
11 *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P.
12 56(e)). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury
13 could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.
14 242, 248 (1986). The non-movant's bare assertions, standing alone, are insufficient to create
15 a material issue of fact and defeat a motion for summary judgment. *Id.* at 247-48. However,
16 in the summary judgment context, the Court construes all disputed facts in the light most
17 favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir.
18 2004).

19 **III. DISCUSSION**

20 American Family seeks summary judgment on numerous claims and issues before the
21 Court. First, American Family argues that it cannot be found in bad faith for its failure to pay
22 the appraisal award in light of O'Brien's alleged fraud involving Tommy's additional living
23 expenses or for its investigation, evaluation and settlement of the structure claim. Second,
24 American Family argues that, under the terms of the insurance policy, O'Brien cannot recover
25 the entire appraisal award. Third, American Family argues that its conduct does not warrant
26 the imposition of punitive damages. Finally, American Family argues that O'Brien's claims
27 based on Arizona's Unfair Claims Settlement Practices Act, the damage to his personal
28 property, and the termination of additional living expenses fail as a matter of law.

O'Brien filed a response and therein concedes that he has no separate claim under the Unfair Claims Settlement Practices Act. O'Brien also concedes that he has no claim based on damage to his personal property and no claim based on American Family's decision to terminate additional living expenses. To the extent American Family seeks summary judgment on these claims, the requested relief is granted. To the extent the parties argue the admissibility of certain evidence in light of O'Brien's concessions, the Court declines to address the issue and instructs that the parties may offer into evidence anything they deem relevant to the remaining issues and the Court will determine admissibility thereof at the appropriate time.

### A.   Bad Faith

In Arizona, insurance contracts include an implied covenant of good faith and fair dealing that requires the parties to refrain from any conduct that would impair the benefits or rights expected from the contractual relationship. *See Rawlings v. Apodaca*, 726 P.2d 565, 570 (Ariz. 1986). To establish bad faith on the part of the insurer, "'a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim.'" *Deese v. State Farm Mut. Auto. Ins. Co.*, 838 P.2d 1265, 1267-68 (Ariz. 1992) (quoting *Noble v. Nat'l Life Ins. Co.*, 624 P.2d 866, 868 (Ariz. 1981)). The first inquiry involves an objective analysis that focuses on whether the insurer acted unreasonably, while the second involves a subjective analysis regarding "whether the insurer *knew* that its conduct was unreasonable or acted with such reckless disregard that such knowledge could be imputed to it." *Id.* at 507 (emphasis in original).

In March 2000, an *en banc* panel of the Arizona Supreme Court clarified Arizona law regarding first-party bad faith insurance tort claims in *Zilisch v. State Farm Mutual Automobile Insurance Co.*, 995 P.2d 276 (Ariz. 2000). The Supreme Court granted review of the court of appeals' decision and issued its opinion in part "to sort out the relationships among (1) the absence of a reasonable basis for denying a claim, (2) fair debatability, (3) who gets to decide (judge or jury), and (4) evidence of improper claims practices."

*Zilisch*, 995 P.2d ¶ 1. In addition, the Supreme Court was troubled by the court of appeals' holding "that as long as the amount the insurer ultimately offers to its insurers is fairly debatable, nothing else it does in investigating the claim, evaluating the claim, and paying the claim really matters." *Id.* ¶ 17 (noting that such holding raised serious question under Supreme Court's opinion in *Deese*, 838 P.2d 1265). The Supreme Court stated that "[w]hile it is clear that an insurer may defend a fairly debatable claim, all that means is that it may not defend one that is not fairly debatable." *Id.* ¶ 19. In vacating the court of appeals' decision, the Supreme Court clarified that "in defending a fairly debatable claim, an insurer must exercise reasonable care and good faith." *Id.*

The Supreme Court set forth the "basic rules" as follows: "The tort of bad faith arises when the insurer 'intentionally denies, fails to process or pay a claim without a reasonable basis.'" *Id.* ¶ 20 (quoting *Noble*, 624 P.2d at 868). "[C]oming up with an amount that is within the range of possibility is not an absolute defense to a bad faith case." *Id.* ¶ 21. This is so because an insurer "has an obligation to immediately conduct an adequate investigation, act reasonably in evaluating the claim, and act promptly in paying a legitimate claim. It should do nothing that jeopardizes the insured's security under the policy. It should not force an insured to go through needless adversarial hoops to achieve its rights under the policy. It cannot lowball claims or delay claims hoping that the insured will settle for less." *Id.*

Put another way, "while fair debatability is a necessary condition to avoid a claim of bad faith, it is not always a sufficient condition. The appropriate inquiry is whether there is sufficient evidence from which reasonable jurors could conclude that in the investigation, evaluation, and processing of the claim, the insurer acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable." *Id.* ¶ 22 (citing *Noble*, 624 P.2d at 868; *Deese*, 838 P.2d at 1268).

**1.     Failure to Pay the Appraisal Award**

American Family argues that it cannot be found in bad faith for its failure to pay the appraisal award because it uncovered evidence tending to show that O'Brien committed fraud

when he submitted the additional living expenses invoices on behalf of his son, Tommy. The Court disagrees.

When determining whether American Family was in bad faith for its failure to pay the appraisal award, the Court is concerned not only with the point in time the alleged fraud was first discovered, but with any subsequent investigation and evaluation of the fraud as well. *See Zilisch*, 995 P.2d at ¶ 21. Accordingly, the pertinent information that the Court must consider includes the timing and nature of the initial discovery, the facts uncovered upon initial discovery, the timing and nature of any additional investigation, and the facts uncovered during the additional investigation.

The record before the Court indicates that American Family filed its motion to amend to assert the fraud counterclaim on May 15, 2002. However, the record does not clearly indicate when American Family first learned of the alleged fraud or what information, other than the April 24, 2002 copies of the two checks from Frederick to O'Brien and his mother, was initially uncovered. Further, the record does not indicate what additional steps, if any, American Family took to investigate the alleged fraud and/or verify the information after the initial discovery. Finally, the Court notes that O'Brien and Frederick have offered an innocent explanation concerning the alleged fraud. As a result, the Court finds that there is a genuine issue of material fact concerning whether American Family, in the discovery, investigation, and evaluation of the fraud allegation, acted unreasonably and whether it knew or was conscious of the fact that its conduct was unreasonable.[8]

**2.  American Family's Investigation, Evaluation and Settlement of the Structure Claim**

American Family claims that it cannot be found in bad faith for its investigation,

---

[8] As a corollary, American Family requests this Court find that the commission of fraud precludes recovery on the entire claim. The requested relief is couched in terms of American Family having a reasonable basis for not paying the appraisal award. Because the Court finds a genuine issue of material fact concerning American Family's reasonableness in the discovery, investigation and evaluation of the fraud allegation, and because American Family has not moved for summary judgment on its fraud counterclaim, the Court declines to address the effect fraud has upon the claim.

- 10 -

evaluation and settlement of the structure claim. Again, the Court disagrees.

As *Zilisch* instructs, the Court must consider the entire claim process to determine whether there is sufficient evidence from which reasonable jurors could conclude that American Family acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable. From the time O'Brien contacted American Family to report cracks in the residence's slab (April 2000) to the appraisal award (May 2002), over two years had passed. While American Family initially paid the claim in July 2000, additional problems arose that required further investigation and evaluation. The facts set forth herein clearly show that the parties dispute why the additional investigation and evaluation took almost two years to complete. American Family contends that O'Brien and his consultants caused the delay by their obstructionist behavior and by failing to provide information on a timely basis, while O'Brien contends that American Family's refusal to timely and reasonably consider and evaluate the additional damage caused the delay. Clearly, there is a genuine issue of material fact. Accordingly, the Court is unable to conclude from the record that American Family cannot be found in bad faith for its investigation, evaluation and settlement of the structure claim.

### B.  Recovery of the Entire Appraisal Award

American Family claims that, under the terms of the insurance policy, O'Brien cannot recover the entire May 10, 2002 appraisal award. Specifically, American Family claims it is only obligated to pay the sum actually and necessarily spent on repairs, which sum is claimed to be far less than the appraisal award. Alternatively, American Family claims that the unused portion of the payments it already made under Coverage A must be credited against the appraisal award and that the appraisal improperly included $4,141.00 for the cost of O'Brien's consultants.

O'Brien concedes that American Family is entitled to a credit against the appraisal award for the unused portion of the payments already made under Coverage A. However, the Court has reviewed the record and is unable to determine the correct amount of the

1  unused portion of the payments already made.[9]  Accordingly, the Court finds only that
2  American Family is entitled to a credit against the appraisal award for the unused portion of
3  the payments already made under Coverage A.

4  Further, counsel for O'Brien represented at oral argument that he would concede the
5  issue of the improper inclusion of the consultant fees if the Court finds the record supports
6  American Family's position.  Upon review of the record, the Court finds that the appraisal
7  award does not include a line item breakdown of the amount of the loss.  However, American
8  Family has submitted the affidavit of its appraiser, Greg McMahon, who attests therein that
9  the appraisal award includes $4,141.00 for O'Brien's consultants.  O'Brien has not submitted
10 any evidence contradicting McMahon's affidavit.  Accordingly, the Court finds that the
11 appraisal award improperly included $4,141.00 for O'Brien's consultants.  *See Hanson v.*
12 *Commercial Union Ins. Co.*, 723 P.2d 101, 104 (App. 1986).

13 Finally, regarding American Family's argument that it is only obligated to pay the sum
14 actually and necessarily spent on repairs, the Court finds that the record is not clear as to
15 what repairs have been completed, what repairs remain to be completed, the actual amount
16 spent on the repairs, and the total amount paid to O'Brien under Coverage A.  Accordingly,
17 the Court declines to address American Family's argument that it is only obligated to pay the
18 sum actually and necessarily spent on repairs.

### C. Punitive Damages

20 Finally, American Family contends that the record does not support a finding of
21 punitive damages in the event it is found in bad faith.  The Court agrees.

22 "Punitive damages primarily further the same objectives underlying criminal law:
23 punishing the defendant and deterring the defendant and others from future misconduct."
24 *Gurule v. Ill. Mut. Life & Cas. Co.*, 734 P.2d 85, 86 (Ariz. 1987) (citing *Linthicum v.*
25 *Nationwide Life Ins. Co.*, 723 P.2d 675, 679 (Ariz. 1986)); *see Haralson v. Fisher*

---

[9] The Court notes that there are inconsistencies between the calculations prepared by the parties as to the actual sums.  At this time, the Court is neither able nor inclined to analyze the record to determine which figures are correct.

1  *Surveying, Inc.*, 31 P.2d 114, 116 (Ariz. 2001).  "Punishment is an appropriate objective in
2  a civil case only if the defendant's conduct or motive 'involves some element of outrage to
3  that usually found in a crime.'" *Id.* (citing *Rawlings v. Apodaca*, 726 P.2d 565, 578 (Ariz.
4  1986)).  "Punitive damages are therefore 'undeserved as punishment' unless defendant acted
5  with a knowing, culpable state of mind, or defendant's conduct was so egregious that the
6  requisite mental state can be inferred." *Id.*

7  "If defendant did not act with an 'evil mind,' . . . compensatory damages usually
8  provide the optimum level of deterrence." *Id.*  Indeed, something more than the commission
9  of a tort is always required before a defendant can be held liable for punitive damages.
10 *See id.* at 87 (citing *Rawlings*, 726 P.2d at 578) ("[T]o obtain punitive damages, plaintiff
11 must prove that defendant's evil hand was guided by an evil mind."); *see Linthicum*, 723 P.2d
12 at 680 ("We hold that before a jury may award punitive damages there must be evidence of
13 an 'evil mind' and aggravated and outrageous conduct."). "The requisite 'something more,'
14 or 'evil mind,' is established by [clear and convincing] evidence that defendant either
15 (1) 'intended to injure plaintiff or (2) consciously pursued a course of conduct knowing that
16 it created a substantial risk of significant harm to others.'" *Id.* (quoting *Rawlings*, 726 P.2d
17 at 578); *see Linthicum*, 723 P.2d at 681 ("We hold that the burden of proof for punitive
18 damages is by clear and convincing evidence."); *see also Thompson v. Better-Bilt Aluminum*
19 *Prods. Co.*, 832 P.2d 203, 208-10 (Ariz. 1992) (requiring clear and convincing evidence).
20 Significantly, "[t]he standard articulated in *Rawlings* requires more than 'reckless
21 indifference.'" *Id.* at 88 (citing *Filasky v. Preferred Risk Mut. Ins. Co.*, 734 P.2d 76, 84 n.3
22 (Ariz. 1987); *Linthicum*, 723 P.2d at 680); *see Rawlings*, 726 P.2d at 578 ("Indifference to
23 facts or failure to investigate are sufficient to establish the tort of bad faith but may not rise
24 to the level required by the punitive damage rule.").

25 In this case, the Court does not find that a reasonable jury could conclude by clear and
26 convincing evidence that American Family engaged in outrageous, aggravated, malicious,
27 or fraudulent conduct.  *See Rawlings*, 726 P.2d at 578.  In other words, while the Court will
28 deny American Family's summary judgment on bad faith, the Court does not find that

something more justifying punitive damages has been alleged. Therefore, American Family's summary judgment on punitive damages will be granted.

Accordingly,

**IT IS ORDERED** that American Family's Motion for Partial Summary Judgment (Doc. # 149) is GRANTED to the extent it seeks dismissal of Plaintiff's punitive damage claim.

**IT IS ORDERED** that American Family's Motion for Partial Summary Judgment (Doc. # 149) is GRANTED to the extent it seeks dismissal of Plaintiff's claims based on the Unfair Claims Settlement Practices Act, the damage to his personal property, and the termination of additional living expenses.

**IT IS FURTHER ORDERED** that American Family's Motion for Partial Summary Judgment (Doc. # 149) is GRANTED to the extent American Family is entitled to a credit against the appraisal award for the unused portion of the payments already made under Coverage A.

**IT IS FURTHER ORDERED** that American Family's Motion for Partial Summary Judgment (Doc. # 149) is GRANTED to the extent the appraisal award improperly included $4,141.00 for the cost of Plaintiff's consultants.

**IT IS FURTHER ORDERED** that American Family's Motion for Partial Summary Judgment (Doc. # 149) is DENIED in all other respects.

**IT IS FURTHER ORDERED** that American Family's Partial Motion to Strike Plaintiff's Statement of Facts (Doc. # 164) is DENIED without prejudice as the complained of statements and exhibits were not considered by the Court in ruling on the Motion for Partial Summary Judgment.

DATED this 31st day of May, 2006.

_____
James A. Teilborg
United States District Judge